636 A.2d 1179

**Grace and Daniel TROXEL, Administrators of the Estate of Trevor Troxel, Deceased**

v.

**A.I. duPONT INSTITUTE, Ches–Penn Health Services, Inc. and Kevin Browngoehl, M.D.**

**Appeal of: Kevin BROWNGOEHL, M.D.**

**Grace and Daniel TROXEL, Administrators of the Estate of Trevor Robert Troxel, Deceased, Appellants,**

v.

**A.I. duPONT INSTITUTE, Ches–Penn Health Services, Inc. and Kevin Browngoehl, M.D., Appellees,**

**Grace and Daniel TROXEL, Administrators of the Estate of Trevor Troxel, Deceased**

v.

**A.I. duPONT INSTITUTE, Ches–Penn Health Services, Inc. and Kevin Browngoehl, M.D.**

**Appeal of CHES–PENN HEALTH SERVICES, INC.**

Superior Court of Pennsylvania.

Argued Nov. 9, 1993.

Filed Feb. 4, 1994.

Joseph H. Foster, Philadelphia, for Browngoehl.

Nancy L. Goldstein, Philadelphia, for Troxel.

Fred A. Greenberg, Media, for A.I. duPont Institute.

John L. Aris, Philadelphia, for Ches–Penn Health Services, Inc.

Before WIEAND, OLSZEWSKI and POPOVICH, JJ.

WIEAND, Judge:

In this medical malpractice action against Pennsylvania and Delaware health care providers, the trial court entered summary judgment in favor of A.I. duPont Institute, a Delaware hospital. The plaintiffs and the Pennsylvania health care providers have appealed. After careful review of the complex issues in this appeal, we affirm.

On October 30, 1987, Mary Siple, a non-party, gave birth to a female child, Ashley. Because Ashley was born with microcephaly [1] and a pes cavus deformity of the leg,[2] she was taken for treatment to Ches–Penn Health Services, Inc., a Pennsylvania medical services center, where she was examined by Dr. Kevin Browngoehl, a Pennsylvania physician. Dr. Browngoehl suspected that Ashley was suffering from cytomegalovirus (CMV)[3] and referred her to duPont for additional tests. At duPont, Ashley was seen by Dr. Borkowski, a Delaware neurologist. The tests conducted at duPont, under

1. Microcephaly describes a condition by which the patient suffers from an abnormally small head and/or brain. Schmidt, 2 *Attorney's Dictionary of Medicine* M–123 (1993).

2. Pes cavus deformity, more commonly known as a club foot, is marked by an excessive curvature of the arch of the foot and by permanent abnormal elevation of the heel. Schmidt, 3 *Attorney's Dictionary of Medicine* P–142 (1993).

3. CMV is a ubiquitous disease which is a member of the herpetoviruses group that causes an enlargement of the cells of various organs. In infants, it may result in jaundice, enlargement of the spleen and liver, thrombocytopenic purpura, and possibly mental retardation. The disease is spread by prolonged intimate contact with infected body fluids. Ausman and Snyder, 7 *Medical Library—Lawyers Edition* § 17:29 (1991).

Dr. Borkowski's supervision, confirmed a diagnosis of CMV. In the meantime, Ches–Penn discovered that Ashley's mother, Mary Siple, was also suffering from CMV.

Grace Troxel was a long time friend of Mary Siple, and, in November, 1987, she became pregnant. During her pregnancy she frequently visited Mary Siple and often assisted in feeding and bathing Ashley and in changing her diapers. In May, 1988, Mary Siple learned, allegedly for the first time, that CMV was contagious and posed a special danger to pregnant women. By this time, Grace Troxel had entered the third trimester of her pregnancy and was already infected with CMV. On August 19, 1988, she gave birth to a son, Trevor. Unfortunately, Trevor had acquired CMV from his mother in utero and died from the disease on November 17, 1988.

Grace and Daniel Troxel filed wrongful death and survival actions on behalf of their deceased son and also for the infection of Grace Troxel with CMV. They named as defendants duPont and Ches–Penn, which subsequently joined Dr. Browngoehl as an additional defendant. The essence of plaintiffs' claim was that defendants had failed to inform Mary Siple of the contagious nature of CMV and of the risk to pregnant women who might come into contact with her infant. Dr. Browngoehl filed a cross-claim against the remaining defendants pursuant to Pa.R.C.P. 2252(d).

█ In determining whether it is the substantive law of Pennsylvania or the substantive law of Delaware which is applicable, we apply Pennsylvania conflict of laws principles. In *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), the Supreme Court abandoned the rule of *lex loci delicti*, which had applied the law of the place where the tort was committed, and adopted a methodology which is a combination of the "government interest" analysis and the "significant relationship" approach of Section 145 of the Restatement (Second) of Conflicts. See: *Normann v. Johns–Manville Corp.*, 406 Pa.Super. 103, 108, 593 A.2d 890, 893 (1991), *allocatur denied*, 530 Pa. 645, 607 A.2d 255 (1992); *Giovanetti v. Johns–Manville Corp.*, 372 Pa.Super. 431, 436, 539 A.2d 871,

873 (1988); *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3rd Cir.1991). This more flexible rule allows the courts to conduct an "analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Air Lines, Inc., supra,* 416 Pa. at 21, 203 A.2d at 805. See also: *Miller v. Gay,* 323 Pa.Super. 466, 470, 470 A.2d 1353, 1354–1355 (1983).

> In determining which state has the greater interest in the application of its law, one method is to see what contacts each state has with the accident, the contacts being relevant only if they relate to the "policies and interests underlying the particular issue before the court." *Griffith, supra* 416 Pa. at 21, 203 A.[2d] at 805. When doing this it must be remembered that a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than quantitative scale. *Tooker v. Lopez,* 24 N.Y.2d 569, 576, 301 N.Y.S.2d 519, 524, 249 N.E.2d 394, 398 (1969).

*Cipolla v. Shaposka,* 439 Pa. 563, 565, 267 A.2d 854, 856 (1970). The relevant inquiry, therefore, is not the number of contacts each litigant has had with a state. Instead, a court must evaluate "the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law." *Normann v. Johns–Manville Corp., supra,* 406 Pa.Super. at 108, 593 A.2d at 893.

 After careful review and study, we conclude that insofar as the instant claim is focused upon duPont because of services rendered to a Pennsylvania resident in Delaware by a Delaware health care provider, the State of Delaware has the greater interest in the application of its law. Although it must be conceded that Pennsylvania, in this case the forum state, has an interest in providing redress for wrongs committed against its citizens, here that interest is superseded by Delaware's interest in regulating the delivery of health care services in Delaware. DuPont is a Delaware hospital, and Dr. Borkowski, who treated Ashley, is licensed to practice medicine in Delaware, not Pennsylvania. The patient, who was a

resident of Pennsylvania, was taken to Delaware for treatment and was treated by duPont exclusively in Delaware. No services were rendered by duPont in Pennsylvania. The services rendered and the persons delivering those services in Delaware were regulated by the laws of Delaware, not the laws of Pennsylvania. In treating Ashley, therefore, the hospital was required to follow and abide by the laws of Delaware. As such, duPont and Dr. Borkowski were entitled to rely on the duties and protections provided by Delaware law. Pennsylvania law did not follow Ashley and her mother when they traveled to Delaware to obtain medical care. Any other rule would be wholly unreasonable, for it would require hospitals and physicians to be aware of and be bound by the laws of all states from which patients came to them for treatment. This is not the law.

In *Levin by Levin v. Desert Palace, Inc.*, 318 Pa.Super. 606, 465 A.2d 1019 (1983), an action based on allegedly negligent omissions by a Nevada hotel which catered to large numbers of Pennsylvania residents, the Superior Court observed that the alleged omissions had occurred in Nevada and said:

> Obviously, Pennsylvania has an important interest in protecting the welfare of its citizens. We conclude, however, that this interest is outweighed by Nevada's interest in regulating the conduct and prescribing the liability of hotel owners within its jurisdiction. A hotel owner relies on the laws of the state in which the hotel is located to determine the standard of conduct required of him. It could not be expected that a hotel should comply with the laws of all the states of which its guests are citizens.

*Id.*, 318 Pa.Super. at 610–611, 465 A.2d at 1021. See also: *Kabo v. Summa Corp.*, 523 F.Supp. 1326 (E.D.Pa.1981).

In *Blakesley v. Wolford*, 789 F.2d 236 (3rd Cir.1986), a Pennsylvania resident had travelled to Texas to undergo surgery. When the patient was injured, allegedly as a result of the surgeon's negligence, the court was required to determine whether Pennsylvania's plaintiff friendly law or Texas' defendant protecting law was applicable. Holding that the defendant could properly rely on Texas law, the Court said:

It is true, as the district court states, that "Pennsylvania has an interest in protecting its citizens who are injured by out of state physicians and surgeons who come to Pennsylvania to practice their profession, and in requiring those individuals to satisfy its standards of care and consent." App. at 239–40. However, it does not follow, as the district court stated, that "Pennsylvania's interest is just as strong when its residents travel to other states for surgical procedures prescribed by out of state surgeons during their visits to Pennsylvania." App. 240.

While we may agree with the district court in the former instance, we cannot agree with the district court's later conclusion that would have Pennsylvania law travel with Pennsylvania residents when they arrange to undergo surgical procedures in sister states.

*Id.* at 242 n. 11.

In *Shuder v. McDonald's Corp.,* 859 F.2d 266 (3rd Cir.1988), a Pennsylvania resident had fallen in the parking lot of a McDonald's restaurant in Virginia. A verdict for plaintiff based on Pennsylvania law was reversed by the Third Circuit, which applied Virginia law. As to plaintiff's argument that Pennsylvania's liberal laws were "more just," the Court said:

We, however, cannot regard the alleged justness of Pennsylvania law as a valid reason for applying it. The relative liberality to plaintiffs of Pennsylvania law simply demonstrates that application of Pennsylvania law would further the policies of that state. This is a consideration quite separate from the contacts of Pennsylvania to the accident. Indeed, the Pennsylvania Courts have not hesitated to apply foreign over domestic law even though they thereby bar claims by their residents.

*Id.* at 272 (citation omitted). See also: *Kunreuther v. Outboard Marine Corp.,* 715 F.Supp. 1304 (E.D.Pa.1989) (Jamaica has a stronger interest in determining the standards that govern boats in its territorial waters than Pennsylvania's interest in protecting its citizens); *Tonkon v. Denny's, Inc.,* 650 F.Supp. 119 (E.D.Pa.1986) (Mexican law applicable to action by Pennsylvania resident who fell on sidewalk in Mexi-

co); *Kabo v. Summa Corp., supra* (Because of Nevada's greater interest in regulating its hotel industry, Nevada law applicable to action by Pennsylvania resident for loss of personal property in Nevada hotel).

Health care providers in Delaware are licensed and regulated by the State of Delaware and must comply with the laws of that state. This is not altered merely by the fact that a substantial number of its patients come from other states. Therefore, we reject appellants' argument that Pennsylvania law is applicable either because duPont solicited patients from Pennsylvania or because it accepted referrals from Pennsylvania doctors. Mary Siple elected to travel with her infant child to the duPont children's hospital in Delaware to obtain treatment for her child. This treatment was rendered entirely in Delaware. Under these circumstances, the qualitative contacts of Delaware were greater and more significant than those of Pennsylvania.

Appellants argue that Pennsylvania law should be applied because Grace Troxel may have contracted CMV following contacts with Ashley in Pennsylvania. We reject this argument. In *Griffith v. United Air Lines, Inc., supra,* the Court held that little significance attached to the "purely fortuitous" fact that the plane on which the decedent was riding happened to crash in Colorado. (It could have crashed in any state). *Id.,* 416 Pa. at 23–24, 203 A.2d at 806. Here, too, the place where the wife-plaintiff came into contact with the infected child was merely fortuitous. Contacts between the child and third persons could have occurred in any number of jurisdictions. For all these reasons, therefore, we look to the law of Delaware to determine the duties and obligations owed by Delaware health care providers who render treatment to Pennsylvania residents in Delaware.

It follows that the decision of the Pennsylvania Supreme Court in *DiMarco v. Lynch Homes–Chester County,* 525 Pa. 558, 583 A.2d 422 (1990), even if factually similar—it is not—is not controlling of our decision in this case. In *DiMarco,* the Supreme Court held that a physician could be held liable to a third person for incorrect advice given a patient regarding a

communicable disease (hepatitis) when the physician knew of the patient's sexual partner and should have foreseen that the third party would rely upon the physician's advice to the patient. *Id.,* 525 Pa. at 563–564, 583 A.2d at 425. The Court relied, in part, upon a Pennsylvania statutory requirement that hepatitis, as well as certain other communicable diseases, be reported to local and state boards of health. See: *Crosby by Crosby v. Sultz,* 405 Pa.Super. 527, 539, 592 A.2d 1337, 1343 (1991). The plaintiff's infection, the Court held, was foreseeable in the event the physician's patient was not properly instructed regarding the contagious nature of her malady. *DiMarco v. Lynch Homes–Chester County, supra,* 525 Pa. at 563–564, 583 A.2d at 425.

Neither counsel nor our own research has disclosed a decision of the highest court of Delaware which is on all fours with the facts of this case. In general, however, the liability of a physician or health care provider for malpractice is limited to those persons who are a part of the physician-patient relationship. See: Delaware Health Care Malpractice Insurance Litigation Act, 18 Del.Code § 6801(7) and (8).

Delaware, it appears also, has followed the general principles set forth in the Restatement (Second) of Torts § 315. Pursuant thereto, "[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person ..., or (b) a special relation exists between the actor and the other...." Pursuant to section 319 of the Restatement (Second) of Torts, a special relationship exists where one "takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled...." In *Naidu v. Laird,* 539 A.2d 1064 (Del.Supr.1988), the Superior Court of Delaware found a special relationship between a psychiatrist and his patient which imposed an affirmative duty on the psychiatrist to persons other than his patient to exercise reasonable care in the treatment and discharge of a psychiatric patient. *Id.* at 1072. Therefore, the Court held, a jury could impose liability upon a psychiatrist who had negligently discharged the driver

of a vehicle, who, while in a psychotic state, intentionally drove into plaintiff's husband and killed him.

A comparable relationship did not exist between duPont, on the one hand, and Mary Siple and her infant child, on the other. CMV is a common, but relatively harmless, disease. It becomes dangerous, in general, only if communicated to a pregnant woman who passes it along to the unborn child whom she is carrying. CMV is not a disease which, under Delaware Board of Health regulations for the control of communicable diseases, must be reported to county health officers. The relationship between doctor and patient, therefore, did not alone require duPont or its physician to take steps to prevent Mary Siple or her child from coming into contact with other persons. The transmission of ubiquitous diseases, such as influenza and CMV, may seriously compromise the health of special classes of persons, such as the elderly or the pregnant, but the treatment of such diseases does not impose liability upon the treating physician or health care provider in the event that the disease is communicated by the patient to a third person. The treatment of the disease does not impose a duty on the health care provider to protect any and all persons, known and unknown, from "catching" the disease from the patient.

Section 324A of the Restatement (Second) of Torts also cannot be made the basis for imposing liability on duPont under the circumstances of this case. This section of the Restatement is as follows:

§ 324A. Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Here, there has been neither averment nor evidence that wife-appellant or her child relied on services rendered or advice given by the hospital for their specific protection. Indeed, there is no basis for finding that Grace Troxel relied on any medical advice given to Mary Siple to guide her conduct toward Mary Siple and her child. Similarly, there is no basis for believing that duPont undertook to perform any duty owed by Mary Siple or her child to the wife-appellant or the child she was carrying. There was no physician-patient relationship between them. Finally, there is no basis for finding that duPont increased the risk of harm to appellant or her child. "At best, defendant's conduct merely 'permitted the continuation of an existing risk,' an inadequate basis upon which to impose liability under section 324A(a)." *Ricci v. Quality Bakers of America Co-op, Inc.,* 556 F.Supp. 716 (D.Del.1983) (applying Delaware law).

Here, the hospital did not give incorrect advice regarding the communicable nature of CMV. There is no evidence that the treatment of Ashley was other than of the highest quality. There also is no evidence or averment from which the hospital can be charged with notice of the persons who might touch or come into contact with the child. Under such circumstances, Delaware would not impose liability on the provider merely because the disease was communicated to a friend of Mary Siple and the friend's child. Indeed, it is doubtful that the Pennsylvania courts would expand the holding in *DiMarco v. Lynch Homes–Chester County, supra,* to impose liability upon a provider under the circumstances of this case.

Affirmed.